UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | } | |
| | } | |
| v. | } | 1:17-cr-00471-MHH-TMP |
| | } | |
| CANTRELL LAMONT BURWELL, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION AND ORDER

Cantrell Burwell is charged in a three-count indictment with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1, pp. 1-3). Mr. Burwell has asked the Court to suppress all evidence obtained as a result of what Mr. Burwell characterizes as an unconstitutional search of his vehicle following a traffic stop. (Doc. 25). For the reasons discussed below, the Court grants Mr. Burwell's motion to suppress.

## I. BACKGROUND

On September 16, 2016, at approximately 2:46 a.m., Anniston Police Department Officer Josh Powers conducted a traffic stop of a black Chevrolet

Tahoe that Mr. Burwell was driving. (GX-1, 00:00).[1] Officer Powers informed Mr. Burwell that he pulled him over for failure to maintain lane. (GX-1, 00:17-00:23). Mr. Burwell handed Officer Powers his driver's license, registration, and proof of insurance. (GX-1, 00:23-00:25). Mr. Burwell informed Officer Powers that he and his passenger, Kelly Boucher, were returning home to Toney, Alabama after fishing in LaGrange, Georgia. (GX-1, 00:34-01:13). Officer Powers collected Ms. Boucher's license. (GX-1, 02:03-02:07).

Officer Powers returned to his patrol car to check whether Mr. Burwell or Ms. Boucher had outstanding warrants. Neither did. (GX-1, 02:11-09:22). Officer Collins then arrived on the scene. (GX-1, 09:30). Officer Powers told Officer Collins that he thought that Mr. Burwell was "real nervous." (GX-1, 09:33-09:34). Officer Powers added that Mr. Burwell had a temporary insurance card. (GX-1, 09:55-10:23). Officer Powers said, "so I can't write him for not having proof to tow it, so I'm gonna try and get in that car." (GX-1, 10:19-10:24). Officer Powers said, "I'm gonna get him out and explain to him and write him a warning and try to sweet talk my way in." (GX-1, 10:51-10:58).

Officer Powers told Officer Collins that Mr. Burwell had prior drug possession charges. (GX-1, 10:58). Officer Powers stated that he doubted that Mr. Burwell was returning from a fishing trip because it was 2:30 a.m., and other than

---

[1] Officer Powers's body camera recorded the incident. (GX-1 & GX-2).

fishing poles, Mr. Burwell did not have fishing gear in his car. (GX-1, 10:58-11:18).[2] Officer Powers said that he did not understand why Mr. Burwell would leave LaGrange, Georgia at midnight or 1:00 a.m. to drive to Toney, Alabama, and he did not understand why Mr. Burwell had to travel so far to find a place to fish. (GX-1, 11:18-11:30). Officer Powers commented that Mr. Burwell could have been driving that particular route to avoid "the gauntlet," a stretch of I-20 that law enforcement routinely monitors. (GX-1, 11:33-11:56).[3]

Officer Powers said "here we go" and returned to Mr. Burwell's car to launch his effort to "sweet talk" his way into consent. (GX-1, 12:02-12:14). Officer Powers told Mr. Burwell that he was giving him a warning for improper lane usage and asked Mr. Burwell to step out of the car. (GX-1, 12:14-12:25). Mr. Burwell complied, and Officer Powers patted him down. (GX-1, 12:33-13:26). Officer Powers discovered about $600 in cash from Mr. Burwell's pocket. (GX-1, 12:46-12:59). Mr. Burwell followed Officer Powers back to the patrol car so that Officer Powers could explain the warning. (GX-1, 13:31-13:38). Using a friendly tone, Officer Powers told Mr. Burwell that he was just "giv[ing him] a warning on that – I know it's late." (GX-1, 13:33-13:36). Mr. Burwell thanked Officer

---

[2] At the suppression hearing, Officer Powers testified that Mr. Burwell had fishing poles, rods, and reels in the back of the car. Officer Powers believed that Mr. Burwell should have had a cooler too if he truly were on a fishing trip.

[3] At the suppression hearing, Officer Powers testified that "the gauntlet" is a stretch of highway with a strong county law enforcement presence.

Powers. (GX-1, 13:46-13:50). As Officer Powers filled out the warning paperwork, using a friendly tone, he asked Mr. Burwell about the fishing trip and questioned Mr. Burwell's decision to leave at an odd hour. (GX-1, 13:38-15:34). Mr. Burwell answered all of Officer Powers's questions. (GX-1, 13:38-15:34).

Officer Powers returned Mr. Burwell's and Ms. Boucher's licenses to them. (GX-1, 15:34-15:45). Officer Powers and Mr. Burwell spoke briefly, Officer Powers joking about the number of times he accidentally kept someone's license. (GX-1, 15:37-15:56). Officer Powers then said, "all right man, here's that warning. Like I said, that's for when I had you pulled over, you were swerving a little bit, not terrible but you come over on that fog line a couple times. So I was just making sure you was alright." (GX-1, 15:56-16:05). Officer Powers handed Mr. Burwell the warning and said "there's that back." (GX-1, 16:09).

As Mr. Burwell turned and began to walk towards his car, (GX-1, 16:10), Officer Powers said, "hey before you go, you care if I ask you a few more questions?" (GX-1, 16:10-16:12). Mr. Burwell said "sure." (GX-1, 16:12). Officer Powers said, "all right, man. Our boss has been on us pretty bad about being productive and trying to, you know, do work -- they like to see us out here working. Part of our job is to, you know, find drugs, large amounts of money, firearms, anything -- stuff like that. You don't have anything like that in the car do you?" (GX-1, 16:13-16:32). Mr. Burwell responded, "no sir, you can check."

4

(GX-1, 16:33). Officer Powers asked, "you don't care if I search it real quick?" and Mr. Burwell gave consent. (GX-1, 16:34-16:35).

After having Ms. Boucher exit the car, Officer Powers searched inside the car. (GX-1, 16:36-27:54). After searching the passenger compartment for more than 10 minutes, Officer Powers opened the hood of the car. Under the hood, he found a handgun and methamphetamine. (GX-1, 27:52-28:08, 29:23-30:25). Officer Powers arrested Mr. Burwell. (GX-1, 28:08-29:23).

In his motion to suppress, Mr. Burwell argues that Officer Powers's search under the hood of the car exceeded the scope of the consent that he (Mr. Burwell) provided. (Doc. 25, pp. 3-6). In response, the United States argues that Officer Powers reasonably interpreted Mr. Burwell's consent to extend beyond the interior of the car. (Doc. 26, pp. 4-7). In reply, Mr. Burwell argues that his consent was ineffective because Officer Powers improperly elicited consent after the traffic stop ended, and the interaction had not become a consensual encounter. (Doc. 29, pp. 1-5).

## II. ANALYSIS

A. <u>The traffic stop was complete before Officer Powers asked for permission to search Mr. Burwell's car.</u>

"A seizure justified only by a police-observed traffic violation, [] 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S.

5

---, 135 S. Ct. 1609, 1612 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "On-scene investigation into other crimes [] detours from that mission." *Rodriguez*, 135 S. Ct. at 1616. "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.*[4]

When conducting a traffic stop, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). Such inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615. These incidental checks ensure "that vehicles on the road are operated safely and responsibly," and therefore "serve the same objective as enforcement of the traffic code" and do not unconstitutionally prolong the traffic stop. *Id.*

The officer in *Rodriguez* stopped a car that the driver was operating on the shoulder of the road. The officer gathered the driver's license, registration, and proof of insurance, performed a records check on the driver, identified the

---

[4] With respect to officer safety, a law enforcement officer conducting a traffic stop may "take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616. There is nothing in the video recording of the traffic stop or in Officer Powers's testimony that suggests that Officer Powers had any particular concerns for his safety during the traffic stop. His desire to get into the car that Mr. Burwell was operating was tied solely to his interest in detecting possible drug trafficking.

6

vehicle's passenger, and issued a written warning to the driver for driving on the shoulder. The officer testified that at that point, the driver and passenger "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." *Rodriguez*, 135 S. Ct. at 1613. Nevertheless, the officer continued to detain the driver and walked a drug dog around the car, even though the driver had declined the officer's request for permission for a dog sniff. Finding that a "dog sniff is not fairly characterized as part of the officer's traffic mission," the Supreme Court held that the drug dog search was unconstitutional because it unlawfully prolonged the detention. *Id.* at 1615.[5]

There may be aspects of an officer's traffic mission that may legitimately prolong a traffic stop. In *United States v. Vargas*, the Eleventh Circuit established that a police officer may lawfully prolong a traffic stop after issuing a citation for the traffic violation to resolve the disposition of the stopped vehicle. 848 F.3d 971, 974-75 (11th Cir. 2017). In *Vargas*, a police officer stopped a car for following

---

[5] The law enforcement officer wanted to have his dog sniff the car in part because when the officer approached the car, "he smelled an 'overwhelming odor of air freshener coming from the vehicle,' which is, in his experience, 'a common attempt to conceal an odor that [people] don't want . . . to be smelled by the police.' App. 20–21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was 'more nervous than your typical passenger' who 'do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation.' *Id.,* at 34." *Rodriguez*, 135 S. Ct. at 1622 (Thomas, J., dissenting). There is no such evidence in this case.

7

too closely behind another car and issued a written warning for the violation. Because neither the driver nor the passenger had a driver's license, the officer questioned the occupants to determine how to safely and legally move the car. During this inquiry, the driver gave the officer consent to search the car. The Eleventh Circuit found that even though the police officer continued to detain the driver after he issued the warning ticket, the officer did not unlawfully prolong the traffic stop. *Vargas*, 848 F.3d at 875. The Eleventh Circuit explained that "[p]reventing them from driving off without a license is lawful enforcement of the law, not unlawful detention. What prolonged the stop was not [the officer's] desire to search the vehicle but the fact that both occupants of it could not lawfully drive it away." *Id.* at 974-75.

Here, "[w]hat prolonged the traffic stop" was Officer Powers's "desire to search the vehicle." The traffic stop was complete before Officer Powers asked to search Mr. Burwell's car. There was a clear end to the traffic stop for failure to maintain the lane of traffic when Officer Powers returned Mr. Burwell's license, explained the warning to Mr. Burwell, and gave Mr. Burwell the written warning. At this point, Officer Powers's traffic mission was complete. The break in the chain was clear when Officer Powers began discussing the pressure he was under to be "productive." That new conversation related solely to Officer Powers's desire to search Mr. Burwell's vehicle and his goal of obtaining consent from Mr.

8

Burwell for a search.

Unlike the officer in *Vargas*, Officer Powers did not have to resolve additional matters with the car after he gave Mr. Burwell a warning. Officer Powers observed no evidence of criminal conduct in the vehicle; he saw no guns or drugs – he smelled no marijuana. He noted that Mr. Burwell seemed nervous, but there is nothing particularly remarkable about a driver being nervous during a traffic stop. During the suppression hearing, Officer Powers acknowledged that drivers typically are nervous during a traffic stop; even he gets nervous when a police officer pulls him over. As the body camera footage reveals, Officer Powers prolonged the stop because he wanted to "sweet talk [his] way in" to the vehicle. (GX-1, 10:19-10:24; 10:51-10:58). Officer Powers testified that he wanted to get into the car because he had a hunch that something was going on.

B. Mr. Burwell's consent to search was coerced.

The United States argues that even if the traffic stop ended before Mr. Burwell gave consent, the traffic stop had become a consensual encounter. (Doc. 32, p. 3). According to the United States, Mr. Burwell was not detained when he gave consent to search, so his Fourth Amendment rights were not implicated. (Doc. 32, p. 3).

A consensual encounter between a citizen and a police officer does not implicate the Fourth Amendment. *United States v. Perez*, 443 F.3d 772, 778 (11th

Cir. 2006). A *Terry* traffic stop shifts from a Fourth Amendment seizure to a consensual encounter "'if a reasonable person would feel free to terminate the encounter.'" *United States v. Ramirez*, 476 F.3d 1231, 1238 (11th Cir. 2007) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)).

"There is no bright-line 'litmus test' for whether a traffic stop is a seizure or is a consensual encounter." *Ramirez*, 476 F.3d at 1240 (quoting *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996)). Instead, a district court must examine the totality of the circumstances to determine whether a reasonable person would feel free to terminate the encounter. *Ramirez*, 476 F.3d at 1240. "Among other things," a district court considers "'whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.'" *Perez*, 443 F.3d at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)). A court "does not apply these factors rigidly," and "[t]he ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). The Government bears the burden of proving that an encounter was consensual. *Jordan*, 635 F.3d at 1186.

In *Ramirez*, the Eleventh Circuit considered whether a traffic stop had shifted to a consensual encounter before a citizen gave consent to search his car. There, police officers stopped a motorist for failing to maintain lane on an interstate. Officers gathered the driver's license and registration, questioned the driver about his vehicle and his travel plans, checked the validity of the driver's license, ran a background check on the driver, and issued a warning citation for the traffic violation. The officers gave the driver the warning citation, returned the driver's license and registration, and advised the driver that "the traffic stop [was] over." *Ramirez*, 476 F.3d at 1234. Afterwards, but "almost simultaneous[ly]," an officer asked the driver if he was carrying anything illegal in the car. *Id.* at 1239. The driver responded by volunteering that the officer could search the car, and the driver signed a consent to search form after the officer explained the substance of the form. 476 F.3d at 1234.

The Eleventh Circuit found that a reasonable person in the driver's circumstances would have felt free to terminate the encounter after he received his documentation and the written warning. *Ramirez*, 476 F.3d at 1240. The Eleventh Circuit based its conclusion "not only on the fact that [the driver] had received all of his documentation and thus had everything he needed to proceed on his way, but also that his follow-up discussion with [the officer] appears, from the videotape of the event, to have been fully cooperative and non-coercive." *Id.* Accordingly, the

Eleventh Circuit found that the driver consented to the post-citation encounter and was not detained when he gave consent to search. *Id.*

Here, Mr. Burwell cooperated at all times, and Officer Powers gave Mr. Burwell everything that Mr. Burwell needed to proceed on his way. But the similarities to *Ramirez* end there because Officer Powers coerced Mr. Burwell's consent to search. It was not the coercion of strong-arm tactics or intimidation; Officer Powers did not unholster his weapon, and, after the pat down, he had no physical contact with Mr. Burwell. Officer Powers did not use a threatening tone of voice. Instead, he used "sweet talk." And he used his friendly tone to exert a more subtle but equally improper form of pressure – the pressure of a debt that Officer Powers created and made Mr. Burwell feel compelled to oblige.

First, Officer Powers let Mr. Burwell know that he was giving him a break, stating that he (Officer Powers) was just issuing a warning because it was late. The tone of the conversation and Mr. Burwell's expression of thanks make clear that Mr. Burwell understood that Officer Powers was using restraint in selecting a warning rather than a citation. To cement the feeling of good will, Officer Powers joked with Mr. Burwell. Then, when the traffic stop was over, Officer Powers asked for a favor in return – the quid pro quo for his generosity to Mr. Burwell during the traffic stop. Officer Powers asked Mr. Burwell to help him look good for his boss because his boss had "been on [him] pretty bad." (GX-1, 16:13-

16:35). Officer Powers told Mr. Burwell that part of his job as a law enforcement officer was to search for drugs, firearms, and money, and he said that his boss "like[s] to see us out here working." *Id.* Officer Powers motioned to the car and asked "you don't care if I search it real quick?" *Id.* Mr. Burwell then consented. Unlike the law enforcement officer in *Ramirez*, Officer Powers did not tell Mr. Burwell that "the traffic stop [was] over," and after Officer Powers asked for the pay-off for going easy on Mr. Burwell, he did not tell Mr. Burwell that he was free to say "no." Officer Powers did not try to get a written consent form from Mr. Burwell.

During the suppression hearing, Officer Powers testified that an officer may use a friendly demeanor to de-escalate tension during a traffic stop. That is a wise thing to do. Inducing consent to search by offering a driver a favor and requesting one in return is not. Officer Powers was in a position of authority during the traffic stop. Mr. Burwell appreciated that, and he understood that Officer Powers could exercise that authority in a variety of ways. Officer Powers's use of "sweet talk" did not diminish his authority; it was a product of his authority. So too was the restraint Officer Powers exercised in giving Mr. Burwell a written warning instead of a citation, with the attendant fees and court appearance. Officer Powers used his authority to create a sense of obligation, and he used Mr. Burwell's sense of indebtedness to "get in that car." To refuse Officer Powers's request to search, Mr.

Burwell would have had to deny an officer who had just let him off easy with a warning and place that officer in jeopardy with his boss. This is coercion. A reasonable person under these circumstances would not have felt free to say no when Officer Powers asked, "you don't care if I search [your car] real quick?"

The Supreme Court's careful discussion of law enforcement pressure tactics in *Miranda v. Arizona* dispels any notion that Officer Powers's conduct was constitutionally sound. 384 U.S. 436 (1966). *Miranda*, of course, concerns coerced confessions, but the Supreme Court's discussion of coercive tactics applies equally here.[6] In *Miranda*, the Supreme Court "stress[ed] that the modern practice of in-custody interrogation is psychologically rather than physically oriented." 384 U.S. at 448. Citing its decision in *Chambers v. Florida*, 309 U.S. 227 (1940), the Supreme Court reiterated that "coercion can be mental as well as physical." 384 U.S. at 448. Examining interrogation practices described in police manuals, the Supreme Court explained that law enforcement officers use those practices to "persuade, trick, or cajole [an individual] out of exercising his constitutional rights." 384 U.S. at 455. Among those practices is the tactic of an officer showing himself to be "a kindhearted man" who befriends the subject and tries to help him – for example, Officer Powers's statement "I was just making sure you was

---

[6] Indeed, the Fifth Amendment right to remain silent and avoid self-incrimination is, in many respects, similar to the Fourth Amendment right to walk away from a law enforcement officer at the conclusion of a lawful traffic stop and avoid a search for evidence of criminal conduct.

alright" and his decision to issue only a warning because "I know it's late." (GX-1, 13:33-13:36, 15:56-16:05); 384 U.S. at 452.

As in *Miranda*, the coercive nature of the encounter between Officer Powers and Mr. Burwell may have been alleviated if Officer Powers had told Mr. Burwell that the traffic stop was over or that he was not obligated to consent to the search. *See Miranda*, 384 U.S. at 467 (to combat the pressures that "undermine the individual's will to resist" and "to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights").[7] The Court recognizes that as a general rule, to prove that consent is valid, the United States does not have to demonstrate that an officer told a driver that he "was free to go." *Ohio v. Robinette*, 519 U.S. 33 (1996). But officers are relieved of the obligation to inform drivers of their rights only in "normal consent search[es]," *Robinette*, 519 U.S. at 39, and "'knowledge of the right to refuse consent is one factor to be taken into account'" in determining whether consent is valid, *Robinette*, 519 U.S. at 39 (quoting *Schneckloth v.*

---

[7] During the suppression hearing, Officer Powers testified that during a traffic stop, law enforcement officers may try to put an individual at ease so that the individual will cooperate and consent to a search. Officer Powers acknowledged that he is not trained to tell individuals that they do not have to cooperate and that they are free to leave when a traffic stop is complete. As in *Miranda*, this coercive law enforcement practice of befriending a defendant during a traffic stop and offering a defendant a break during the stop before asking the defendant for permission to search after the stop is complete seems to be a recurrent issue. *Miranda*, 384 U.S. at 491. The Court recently conducted another suppression hearing that involved the use of this tactic. *See United States v. Wilson*, 17-cr-428-MHH-HNJ.

15

*Bustamonte,* 412 U.S. 218, 231 (1973)).[8] In a normal set of circumstances, a law

---

[8] The Supreme Court remanded the *Robinette* case to the Ohio Supreme Court for the state court to determine whether the driver's consent was voluntary based on the totality of the circumstances. *Robinette*, 519 U.S. at 39-40. On remand, the Ohio Supreme Court found that a reasonable person would not have felt free to refuse the officer's request to search. *State v. Robinette*, 685 N.E.2d 762 (Ohio 1997). Although it is not binding precedent, the Ohio Supreme Court's rationale is persuasive:

> In the case at bar, Officer Newsome stopped Robinette for driving sixty-nine miles per hour in a forty-five mile-per-hour construction zone. Officer Newsome asked Robinette to step to the rear of his (Robinette's) car, which was in front of the patrol car. Newsome returned to his patrol car and turned on a video camera. Newsome gave Robinette a verbal warning *and advised Robinette that he was letting him off with only a verbal warning. But without any break in the conversation* and still in front of the camera, Newsome then asked Robinette, "One question before you get gone [*sic*]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Robinette denied having any contraband in the car. Newsome then immediately asked Robinette if he could search the car. Robinette hesitated, looked at his car, then back at the officer, then nodded his head. Newsome commenced a lengthy search of Robinette's car. During the search Newsome recovered some marijuana and a pill. Robinette was charged with drug abuse. At the suppression hearing, Robinette provided the following testimony pertaining to the search:
>
> "Q And did he [Newsome] indicate to you that at that time [when he returned from activating the video camera] that he was giving you a warning and that you were free to go?
>
> "A Yes, he did.
>
> "Q And then at that time, I think, as the tape will reflect, the officer asked you some questions about did you have any weapons of any kind, drugs, anything like that. Do you recall that question?
>
> "A Yes.
>
> " * * *
>
> "Q Did you in fact feel that you were free to leave at that point?
>
> "A I thought I was.
>
> " * * *

"Q The officer then asked if he could search your vehicle. What went through your mind at that point in time?

"A Uhm, I was still sort of shocked and I—I thought—I just automatically said yes.

"Q Did—did you feel that you could refuse the officer?

"A No."

Newsome's words did not give Robinette any indication that he was free to go, but rather implied just the opposite—that Robinette was *not* free to go until he answered Newsome's additional questions. The timing of Newsome's immediate transition from giving Robinette the warning for speeding into questioning regarding contraband and the request to search is troubling. As the majority stated in *Robinette I:*

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow." *Id.,* 73 Ohio St.3d at 654, 653 N.E.2d at 698.

When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While Newsome's questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. Even the state conceded, at an oral argument before the United States Supreme Court, that an officer has discretion to issue a ticket rather than a warning to a motorist if the motorist becomes uncooperative. *See* 1996 WL 587659, at 5 (Official Transcript of Oral Argument). From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will. Under *Royer,* this is not sufficient to prove voluntary compliance. *Royer,* 460 U.S. at 497, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236.

We are very mindful that police officers face the enormous and difficult task of fighting crime. Furthermore, we explicitly continue to recognize that officers may conduct checkpoint-type questioning and consensual searches, and may progress to further detention and investigation when individualized suspicion of criminal activity arises during questioning based on reasonably articulable facts. But allowing police officers to do their jobs must be balanced against an individual's

enforcement officer does not (or at least should not) use "sweet talk," offer a driver a favor, and cajole consent by describing the pressures that the friendly officer faces from a supervisor who is "on us pretty bad about being productive." If an officer chooses to use these tactics, then consent potentially may be valid only if the officer tells the driver that he is free to decline. An officer must "undertake to afford appropriate safeguards at the outset of [the request for consent] to insure that [consent is] truly the product of free choice." *Miranda*, 384 U.S. at 457.

Because Officer Powers used coercive tactics to try to trick Mr. Burwell into giving consent, and because Officer Powers did not tell Mr. Burwell that the traffic stop was over or that he was free to leave without consenting to the search, the Court does not find that Mr. Burwell's consent was voluntary. Under the totality of the circumstances in this case, the consent was not valid. Because Mr. Burwell's consent was not valid, the search of his vehicle violated the Fourth Amendment.

The causal connection between the invalid consent and the discovery of the gun and the drugs is not attenuated. The evidence was obtained because of the Fourth Amendment violation. *Compare Hudson v. Michigan*, 547 U.S. 586

---

> right to be free from unreasonable searches. At some point, individual rights must prevail. This is just such a case.

685 N.E. 2d at 770-71 (emphasis in *Robinette*). *Robinette* is different from *Ramirez* because unlike the officer in *Ramirez*, the officer in *Robinette* did not have the driver sign a consent form after explaining the substance of the form. In *Robinette*, the transition from completed traffic stop to search request was seamless.

(2006); *United States v. Farias-Gonzalez*, 556 F.3d 1181 (11th Cir. 2009). Therefore, the evidence obtained as the result of the unconstitutional search cannot be used against Mr. Burwell. *Miranda*, 384 U.S. at 479.

## III. CONCLUSION

The Court recognizes the challenges that law enforcement officers face when assessing a situation and deciding how best to address it. It is not an easy task. The Constitutional boundaries that set the parameters for the task are important. "Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. They knew that 'illegitimate and unconstitutional practices get their footing * * * by silent approaches and slight deviations from legal modes of procedure.'" *Miranda*, 384 U.S. at 459 (quoting *Boyd v. United States*, 116 U.S. 616 (1886)). Officer Powers's deviation from legal modes of procedure may have been slight but it was not harmless; it was unconstitutional. Accordingly, the Court **GRANTS** Mr. Burwell's motion to suppress. The United States may not use evidence obtained as a result of the unconstitutional search of Mr. Burwell's car.[9]

---

[9] Implicit in Officer Powers's effort to "sweet talk" his way into consent was his recognition that he could not articulate probable cause to conduct a search without consent.

**DONE** and **ORDERED** this the 29th day of June, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE